IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARRIE COSTANZO,<br><br>   Plaintiff,<br><br>  v.<br><br>CITY OF CHICAGO,<br><br>   Defendant. | Case No.:<br><br>**Jury Trial Demanded** |

## **COMPLAINT**

Plaintiff Carrie Costanzo, by and through her attorneys, Stowell & Friedman, Ltd., for her Complaint against the Defendant, City of Chicago, alleges as follows:

### INTRODUCTION

1. Carrie Costanzo's story embodies the incredible strides the Chicago Police Department ("CPD") has made since an EEOC lawsuit in the 1970's spurred significant reforms to the hiring and promotion of women in the CPD.

2. Through hard work, talent, and dedication in nearly a decade of work as a police officer, Costanzo has risen through the ranks to become a Sergeant and intends to enjoy a long career serving and protecting the people of Chicago.

3. But despite the substantial improvement in the treatment of women in the CPD over the last half-century since equal employment opportunity has become the law of the land, some vestiges of old-school sex discrimination remain within the CPD.

4. Lieutenant Godfrey Cronin, Costanzo's supervisor, bucked the trend toward fully equal employment within the department, ignoring Costanzo's talent and hard work and instead reducing her to her gender.

5. Rather than view her as an Officer, he publicly called her "hot," "sexy," "broad," and the "horniest chick in the unit." He cornered Costanzo outside a bathroom to introduce her to a man he wanted to "hook her up with." His harassment became so intolerable that it forced Costanzo into a medical leave, which Cronin nonetheless intruded into by appearing unannounced at her dinner with friends, causing Costanzo a panic attack so severe that she was hospitalized.

6. Costanzo hoped to resolve this matter privately within the police force, but unfortunately her formal and informal complaints were met with retaliation, including a transfer away from the prestigious detail she had worked so hard to attain.

7. Costanzo therefore brings this action to remedy the unlawful sexual discrimination, harassment, hostile work environment, and retaliation that the CPD has yet to fully eliminate and ensure truly equal employment opportunities for herself and the female officers who follow in her footsteps.

**JURISDICTION AND VENUE**

8. Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.* This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

9. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Both Plaintiff and Defendant are residents of this District, and the unlawful conduct alleged in this Complaint occurred in this District.

## PARTIES

10. Defendant City of Chicago ("City" or "Defendant") is a municipal corporation organized and existing under the laws of the State of Illinois. Among its divisions is the Chicago Police Department ("CPD").

11. Plaintiff Carrie Costanzo ("Costanzo"), a resident and citizen of Illinois, is female and is currently employed as a Sergeant by the City of Chicago Police Department ("CPD").

## FACTUAL ALLEGATIONS

**Though the CPD Once Excluded Women from Patrols, It Has Made Substantial Progress**

12. Though the Chicago Police Department has had women in its ranks for over a century, for most of that history female officers were few and far between and worked only specialized assignments, and at times were limited to a sex-segregated role called "police matron" and required to wear skirts.[1]

13. In 1973, the EEOC sued the Chicago Police Department for a pattern and practice of sex discrimination in hiring and promotions. At that time, CPD employed only approximately 115 women out of a force of 13,500 sworn personnel, or 0.85% of the department. *United States v. City of Chicago*, 385 F. Supp. 543, 548 (N.D. Ill. 1974). Women at the time were eligible only for officially sex-segregated positions called "police women" or "police matrons" with limited responsibility that did not include patrol work. *Id.*

---

[1] https://www.chicagopolice.org/about/history/

14. In 1974, Judge Prentice Marshall of this District found that CPD discriminated against women in hiring, promotions, and assignments and ordered preliminary injunctive relief, including the landmark requirement to discontinue the rank of "Patrolman" and instead create a unisex position called "Patrol Officer," for which CPD was required to recruit, hire, and assign women "with the same standards and procedures and on an equal basis with men." *Id.* at 546.

15. In those early days of the civil rights laws, the CPD resisted change. By 1976, seeing no progress with the interim unisex hiring standards, Judge Marshall ordered the CPD to adopt a "hiring standard of 16% females" for patrol officers with the goal for female representation in the higher ranks to steadily increase as well. *United States v. City of Chicago*, 411 F. Supp. 218, 243 (N.D. Ill. 1976), *aff'd in part, rev'd in part*, 549 F.2d 415 (7th Cir. 1977)

16. From those early days of court-imposed hiring quotas and later voluntary affirmative action plans, the CPD's treatment of women has improved substantially. Last year, about 25% of CPD's sworn workforce and 23% of its new sworn hires were women.

**Despite Substantial Progress in Its Treatment of Female Police Officers, the City Allowed a Lieutenant to Discriminate Against and Sexually Harass Costanzo**

17. Costanzo began her employment with the CPD as a police officer in approximately February 2015 and has remained a devoted and successful officer. Costanzo has received numerous recognitions and commendations throughout her tenure, including nine Honorable Mention Certificates, an award for officers who have demonstrated outstanding performance above and beyond that required of assignment, multiple Complimentary Letters, a Crime Reduction Award, a Lifesaving Award, a Unit Meritorious Performance Award, and six Emblems of Recognition for Physical Fitness. She has earned a promotion to Sergeant.

18. Upon joining the CPD, Costanzo was assigned to the 2nd District/Wentworth. Due to her outstanding performance, in approximately March 2018, Costanzo was detailed to a specialized unit, the Area Central Bicycle Patrol Unit, covering the Loop and the downtown area.

19. In approximately September 2018, Costanzo attended an off-duty social gathering of police officers hosted by Lieutenant Godfrey Cronin ("Cronin"). At this time, Costanzo did not know Cronin, nor had she ever met him. Shortly after Costanzo arrived at the party, Cronin approached Costanzo and asked her, "Whose hot girlfriend are you?" or words to that effect. Later, Cronin approached Costanzo and another female police officer and told them that they were the "hottest chicks here" and instructed them to collect money from "the boys" for the charity raffle. After the raffle winner was selected, without any warning, Cronin attempted to put his hand into Costanzo's front pants pocket and give her money. Costanzo left the party shortly thereafter because of how uncomfortable Cronin made her feel.

20. In approximately May 2020, CPD assigned Lt. Cronin to be the commanding officer of Costanzo's unit. Shortly after taking command of Costanzo's unit, Cronin commented to Costanzo that he recognized her, remarking, "You were the hot chick" at the party, or words to that effect.

21. Upon Cronin becoming Costanzo's supervisor, Cronin routinely made sexually charged and harassing comments about Costanzo's personal appearance in her presence and the presence of other officers, including comments such as, "Well, aren't you just the sexiest/hottest girl in the unit?" Cronin referred to Costanzo as, "hot," "sexy," "broad," "chick," "sexiest," and "hottest," among others. Cronin's constant sexual comments about Costanzo's appearance caused Costanzo to avoid Cronin when possible.

22. Cronin's harassing and demeaning statements about Costanzo were frequently made in the presence of Costanzo's fellow officers. Mimicking the sexually hostile environment Cronin was creating and following his lead, Costanzo's fellow officers teased and harassed Costanzo as well. The hostile environment Cronin created significantly impaired Constanzo's ability to do her important job and communicate with her colleagues effectively.

23. Cronin's harassment of Costanzo escalated from sexist remarks, to openly humiliating her and sexualizing her in front of her peers. For example, one morning approximately 100 CPD officers, including Costanzo's unit, had breakfast at a restaurant in the Loop. During the meal, Cronin shouted at Costanzo that he had a man he wanted to "hook her up with." Humiliated and embarrassed, Costanzo hid in the bathroom in the hopes that Cronin would cease his harassment; however, when Costanzo finally exited the bathroom, Cronin was waiting for her, along with the male officer he was trying to "hook her up with," blocking her exit and trapping her in the restaurant. Cronin told Costanzo that she and the male police officer should "hook up and exchange numbers." Cronin then grabbed Costanzo's phone from her breast pocket and took a photo of the male officer with her phone so that Costanzo would not "forget his handsome face." After, Constanzo fled the restaurant to find a private place and cried because of the shame and humiliation Cronin caused her in front of so many of her peers.

24. After the incident in the restaurant, Cronin continued to make sexual and sexist comments to and about Costanzo in the presence of Costanzo's peers, causing her embarrassment, humiliation, and emotional distress. Costanzo's peers continued to tease and harass her about Cronin's comments and conduct, making it difficult for Costanzo to effectively perform her job.

25. Cronin's sexual harassment continued and escalated following the incident in the restaurant. For example, during roll call with the entire unit of approximately 120 officers present, Cronin grabbed Costanzo's arm to make her stand before the entire unit, and tightly held Costanzo around her neck against him so that she could not move, as he declared that Costanzo was the "horniest chick in the unit." When Costanzo demurred, Cronin doubled down and demanded that she "name a hornier chick in the room." Costanzo experienced extreme panic, being physically held against her will and humiliated before her peers and colleagues. Following this incident, Costanzo's fellow officers teased her and laughed at her.

26. After the incident at roll call, Costanzo complained to Cronin about his conduct and expressed how badly it made her feel and how demeaning it was. Cronin ignored Costanzo's remarks and refused to acknowledge her feelings or concerns.

27. Cronin's persistent and escalating sexual harassment caused Costanzo severe emotional distress, including panic attacks, anxiety, and bouts of crying.

28. After the roll call incident, Costanzo met with her sergeant and complained about Cronin's humiliating sexual comments during roll call and the ongoing and pervasive hostile work environment and sexual harassment Cronin had subjected her to since he became her supervisor. The sergeant referred who to another sergeant, who dissuaded Costanzo from filing a formal Complaint Register (CR) against Cronin, claiming this issue would be better handled "in-house." Rather, the sergeant suggested he set up a meeting with himself, Cronin and Costanzo so Cronin could apologize—in other words, raise her complaints to a meeting in which the subject of her complaint was the highest-ranking officer in the room. Costanzo felt pressured to agree to this "in-house" option and reluctantly agreed. However, before the sergeant could set up such a

meeting, Costanzo's mental health deteriorated further, and Costanzo suffered severe anxiety and apprehension at the thought of facing Cronin.

29. Ultimately, several days after the roll call incident, Costanzo opened a formal CR against Cronin. However, the City never seriously investigated Costanzo's serious allegations—indeed, on information and belief the CR remains "under investigation" to this day. Instead of protecting Costanzo and the integrity of the Department she was trying to protect, the City quickly retaliated against Costanzo for filing a complaint.

30. In an egregious violation of protocols intended to protect complaining officers from retaliation, the officer investigating Costanzo's CR egregiously broke CPD protocol by informing the entire unit of Costanzo's complaint. The leak had its intended effect—Costanzo was pressured to withdraw her CR against Cronin. Most egregiously, the City forced Costanzo to continue reporting to Cronin and took no action to protect her from further harassment or retaliation.

31. As a result of the continuing and escalating discrimination, harassment, and retaliation, Costanzo was forced to take personal time off ("PTO"). Ultimately, Costanzo was forced to take a stress-related medical leave of absence due to Cronin's conduct and the City's refusal to take any remedial action against Cronin or to protect Costanzo from further harassment or retaliation.

32. However, even on protected medical leave, Cronin continued to harass Costanzo. While Cronin was at a restaurant with friends, the waiter informed Costanzo that her bill was paid for by "the lieutenant." Costanzo then saw Cronin, in his police uniform, outside the restaurant, with the clear implication that he felt emboldened to follow her and intrude into her private life and protected leave with impunity.

8

33. Cronin's intrusion into Costanzo's private life caused her to fear for her safety and to have a panic attack so severe that she was hospitalized. Costanzo required further medical treatment, including out-patient and in-patient mental health treatment for stress, anxiety, PTSD, among other things.

34. After the incident at the restaurant, Costanzo opened another CR against Cronin for his continuing and escalating harassment. No action was taken on that CR, either; on information and belief it too remains "under investigation."

35. Because Cronin continued to harass and intimidate Costanzo even while she was on protected medical leave, and because the City took no action to discipline Cronin or protect her, Costanzo was forced to hire an attorney at her own expense to obtain a Stalking/No Contact Order against Cronin. Cronin vigorously contested Costanzo's petition and several CPD officers from Costanzo's unit testified in support of Cronin. Nonetheless, the court granted Costanzo a Stalking/No Contact Order, which required the court to find that Cronin "engag[ed] in a course of conduct directed at [Costanzo]," where he knew or should have known "that [his] course of conduct would cause a reasonable person to fear for his or her safety or the safety of a third person or suffer emotional distress." 740 ILCS 21/10.

36. In further discrimination and retaliation against Costanzo, the City refused to meaningfully engage with her about safely returning to work from medical leave, unnecessarily delayed her return to work, and forced her to leave her former unit. When Costanzo informed the City that she was ready to return from leave, the City informed Costanzo that she could return to her old unit, but that Cronin would remain the commanding officer. The City provided no assurances or protections to Costanzo that if she returned she would be protected from further

harassment or retaliation from Cronin. In fear for her safety and wellbeing, Costanzo was forced to seek reassignment to another unit.

37. Further, the City delayed Costanzo's return to work throughout the beginning of 2021, including requiring Costanzo perform superfluous fitness tests, attend the police academy, among other tasks intended to delay her return to work.

38. When Costanzo was finally permitted to return from medical leave, the City forced her to relocate to a new unit in the 19th District in Lakeview—a significant step backwards in her career. She had worked hard to earn the more prestigious and financially lucrative detail to the Area Central Bicycle Patrol Unit. The 19th District unit offered less ability to earn overtime, was a less desirable shift, and was overall a less prestigious assignment than the specialized bike unit.

39. Cronin, on the other hand, was permitted to retire as a Lieutenant notwithstanding the still-pending open investigations by the Bureau of Internal Affairs. On information and belief, Cronin retired without summary punishment admonishment record and without any other form of discipline or punishment related to Costanzo's CRs.

40. The City's unlawful discrimination and retaliation caused Costanzo to suffer significant financial losses and irreparably damaged her career. The City's unlawful discrimination and retaliation further caused Costanzo emotional distress and other non-pecuniary losses.

## COUNT I

### SEX DISCRIMINATION IN VIOLATION OF TITLE VII

41. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count I of this Complaint.

42. Title VII makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

43. By the acts and conduct alleged above, Defendant engaged in illegal sexual discrimination against Plaintiff in violation of Title VII.

44. Plaintiff has been harmed as a direct and proximate result of Defendant's unlawful conduct.

## COUNT II

## RETALIATION IN VIOLATION OF TITLE VII

45. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count II of this Complaint.

46. Title VII makes it unlawful for an employer to retaliate against an employee because that employee engaged in protected activity, such as filing a charge of discrimination against her employer or complaining to her employer about discrimination on the job.

47. Plaintiff engaged in protected activity by opposing and reporting Defendant's unlawful discriminatory conduct to her supervisor, Bureau of Internal Affairs, and by filing a charge of discrimination against Defendant with the Equal Employment Opportunity Commission.

48. Defendant subjected Plaintiff to additional discrimination and retaliation because she engaged in protected activity.

49. Plaintiff has been harmed as a direct and proximate result of Defendant's unlawful conduct.

# COUNT III

## SEX DISCRIMINATION AND RETALIATION IN VIOLATION OF ILLINOIS HUMAN RIGHTS ACT, 775 ILCS 5/1-101 et seq.

50. Plaintiff realleges the above paragraphs and incorporates them by reference as though fully stated herein as part of Count III of this Complaint.

51. Defendant is an employer within the meaning of the Illinois Human Rights Act.

52. Plaintiff was and is an employee of Defendant as defined by the Illinois Human Rights Act.

53. 775 ILCS 5/2-102 makes it unlawful for an employer to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

54. 775 ILCS 5/6-101 makes it unlawful for an employer to retaliate against any individual because that individual opposed conduct which he believes in good faith to be unlawful discrimination.

55. Plaintiff engaged in protected activity by complaining about and reporting sex discrimination, sexual harassment, a hostile work environment, and retaliation to Defendant.

56. Defendant took adverse employment actions against Plaintiff in retaliation for engaging in this protected activity.

57. Defendant subjected Plaintiff to discriminatory, harassing, and retaliatory sex-based conduct in violation of the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq.

58. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor and against Defendant as follows:

a. Declare that the acts and conduct of Defendant are unlawful and violate Title VII and the IDHR;

b. Award Plaintiff the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;

c. Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendant's unlawful conduct;

d. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e. Award Plaintiff prejudgment interest;

f. Award Plaintiff attorneys fees, costs, and disbursements; and

g. Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: November 1, 2024

                                              Respectfully Submitted,

                                              */s/ Linda D. Friedman*
                                              *Attorney for the Plaintiff*

STOWELL & FRIEDMAN, LTD.
303 W. Madison, St. 2600
Chicago, Illinois 60606
Phone: 312.431.0888
Fax: 312.431.0228